12-0168-cv(L), 12-0169-cv(CON), 12-0878-cv(CON), 12-0880-cv(CON)*
Franklin Advisers, Inc. v. CDO Plus Master Fund, Ltd.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: March 1, 2013     Decided: August 1, 2013)

Docket Nos. 12-0168, 12-0169, 12-0878, 12-0880*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE BANK OF NEW YORK TRUST COMPANY,
N.A., AS TRUSTEE,

         <u>Plaintiff</u>,

      - v.-

FRANKLIN ADVISERS, INC.,

         <u>Defendant-Appellee</u>,

FRANKLIN CLO II, LTD., FRANKLIN CLO CORP., CHASE MANHATTAN
BANK LONDON NOMINEE FOR SEIRA 13, AS NOMINEE, DEUTSCHE BANK
SECURITIES INC., AS A NOMINEE, GENSEC IRELAND LIMITED, AS A
NOMINEE, HARE & CO., AS NOMINEE, MAC & CO., MASSACHUSETTS
MUTUAL LIFE INSURANCE CO., SUN LIFE INSURANCE CO. OF CANADA,
AS A NOMINEE, TEMPLETON GLOBAL ADVISORS, LTD., AS A NOMINEE,
"JOHN DOE 1," THROUGH "JOHN DOE" 12, THE LAST TWELVE NAMES
BEING FICTITIOUS AND UNKNOWN TO PLAINTIFF, THE PERSONS OR
PARTIES INTENDED BEING THE BENEFICIAL OWNERS OF THE
PREFERRED SHARES, THE SERIES I COMBINATION SECURITY AND THE
CLASS C2 NOTES UNDER COMPLAINT,

         <u>Defendants</u>,

      - v.-

---

     * Appeals docketed as 12-0168-cv(L) and 12-0169-cv(CON)
were closed by stipulation of the parties on March 8, 2012.

CDO PLUS MASTER FUND, LTD., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., AS A NOMINEE,

Defendants-Appellants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Before:      JACOBS, Chief Judge, POOLER, Circuit Judge, and VITALIANO, District Judge.**

Merrill Lynch, Pierce, Fenner & Smith Inc., together with CDO Plus Master Fund, Ltd., (collectively, the "Shareholders"), appeal an order of the United States District Court for the Southern District of New York (Marrero, J.) denying their motion for summary judgment and granting partial summary judgment to Franklin Advisers, Inc. ("Franklin"), in a dispute over the payment of a contingent collateral management fee. The Shareholders argue that the district court erred in relying on extrinsic evidence and concluding that Franklin, as collateral manager, was entitled to the contingent fee after the portfolio produced a twelve-percent internal rate of return, according to the terms of the governing indenture. The Shareholders also appeal Franklin's award of attorney's fees and statutory prejudgment interest. For the following reasons, we affirm

---

** The Honorable Eric N. Vitaliano of the United States District Court for the Eastern District of New York, sitting by designation.

the grant of summary judgment and the award of attorney's fees, vacate the award of prejudgment interest, and remand with the instruction to award actual interest on the judgment.

JAMES C. MARTIN, Reed Smith LLP, New York, New York (James C. McCarroll and C. Neil Gray, on the brief), for Appellants.

JONATHAN L. HOCHMAN, Schindler Cohen & Hochman LLP, New York, New York (Matthew A. Katz, on the brief), for Appellee.

DENNIS JACOBS, Chief Judge:

This interpleader action was initiated by The Bank of New York Trust Company, N.A. ("BNY"), as Trustee of an investment portfolio of collateralized loan obligations, to resolve a contract dispute between certain shareholders and the manager of that portfolio, Franklin Advisers, Inc. ("Franklin"). In dispute are the terms of the underlying indenture and, specifically, terms governing distribution of a Contingent Collateral Management Fee (the "Contingent Fee" or the "Fee"), which was payable to Franklin only if distributions reached a twelve percent internal rate of return ("IRR"). Franklin claimed the Fee (exceeding $7 million) when the portfolio's return surpassed twelve

3

percent upon an optional redemption voted by the shareholders.

On cross-motions for summary judgment, the United States District Court for the Southern District of New York (Marrero, J.) ruled that: (1) the Fee can be paid on an optional redemption; (2) proceeds of an optional redemption should be included in calculating the IRR; and (3) the indenture ("Indenture") is ambiguous as to when the Fee begins to accrue, i.e., whether the fee begins to accrue from the closing date forward, or from the date the portfolio's IRR exceeds twelve percent (an issue the parties resolved by arbitration). On appeal, Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") and CDO Plus Master Fund, Ltd. ("CDO Plus") (collectively, the "Shareholders")[1] argue that each of those rulings was error. They also challenge the court's award of fees and costs, and its award of prejudgment interest at a rate of nine percent pursuant to N.Y. C.P.L.R. § 5001(a). We vacate the award of statutory prejudgment interest and direct that interest be paid only as actually accrued. In all other respects, we affirm.

---

[1] The term "Shareholders" refers specifically to the Appellants, while "shareholders" refers broadly to all holders of CLO II equity.

4

**I**

**A. The Transaction**

The $600 million collateral loan obligation from which this dispute arises, titled "CLO II," closed on July 26, 2001. The securities were collateralized by a pool of leveraged commercial loans and then sold to investors who were paid based on cash flow from the underlying loans.

As collateral manager for CLO II, Franklin was responsible for structuring the transaction with the underwriter and for the active management of the portfolio. Merrill Lynch was engaged as underwriter, and two special-purpose investment vehicles were formed as issuer and co-issuer: Franklin CLO II, Ltd. and Franklin CLO Corp. (the "Issuers"). BNY, as Trustee (and stakeholder here), was responsible for collecting principal and interest payments, paying fees and expenses, and then distributing the remaining proceeds to investors.[2]

On the day of closing, the Trustee and the Issuers executed an Indenture drafted by deal counsel, Cleary Gottlieb Steen & Hamilton LLP ("Cleary"). The same day,

---

[2] BNY succeeded Chase Manhattan Bank, the original Trustee, on October 1, 2006.

Franklin and the Issuers executed a Collateral Management Agreement, incorporating all relevant provisions of the Indenture.  Merrill Lynch as underwriter sold the CLO II securities to investors on the secondary market.  The securities consisted of (1) notes divided into different levels of risk, held by CLO noteholders, and (2) shares of CLO II's equity, held by CLO II shareholders.  As portfolio manager, Franklin assembled and maintained CLO II's assets, which, in the main, were leveraged, secured loans made to below-investment-grade borrowers.  These loans served as collateral for CLO II's debt obligations to the CLO II noteholders.

**B.  Provisions in Dispute**.

1.  The Article 11 "Waterfalls".  The Indenture provides that proceeds from the portfolio were to be distributed by BNY according to two sets of detailed payment priorities on defined, quarterly distribution dates.  The two payment priorities, set out in Article 11, are called "Waterfalls" because the payments cascade downward to a pool at the bottom for distribution to the shareholders.  The first governs distribution of interest proceeds (the "Interest Proceeds Waterfall") and the second governs

6

distribution of principal proceeds derived from obligations paid at maturity or upon liquidation of CLO II (the "Principal Proceeds Waterfall"). The priorities are (1) expenses, (2) noteholders, and (3) shareholders, in that order. Id.

2. Franklin's Fees. Franklin was to be paid three types of fees for its work as collateral manager. Two of them were guaranteed and are not at issue here: the Base Collateral Management Fee and the Subordinated Collateral Management Fee.[3] The dispute is over the Contingent Collateral Management Fee, a performance-based fee contingent on the shareholders having "received an internal rate of return of 12% per annum . . . on the amount of the initial purchase price of the Preferred Shares for the period from the Closing Date through [the] Distribution Date," JA 79-80,[4] a precondition designated the "IRR Hurdle." The base calculation of the Fee is approximately equal to 0.25 percent per annum of the value of the collateral and cash in the deal for a given period.

---

[3] The combined guaranteed fees amounted to approximately $14 million over the life of CLO II.

[4] "JA" refers to the Joint Appendix; "CA" refers to the Confidential Appendix; "SPA" refers to the Special Appendix; and "SA" refers to the Supplemental Appendix.

3. Optional Redemption Provision. CLO II was structured to reach maturity on August 28, 2013. However, Section 9.1(a) of the Indenture provided that, before then, the holders of a majority of the CLO II preferred shares could call for an optional redemption, directing Franklin to sell CLO II's assets, pay its expenses, redeem outstanding notes, and distribute any remaining proceeds to the shareholders.

**C. The Redemption Controversy**. In January 2007, a majority of CLO II shareholders called for an optional redemption, to take effect February 28, 2007. On February 7, 2007, Franklin auctioned off CLO II's portfolio.

It is undisputed that prior to this liquidation Franklin had not achieved the twelve percent rate of return necessary to surmount the IRR Hurdle and earn the Contingent Fee. However, if proceeds on liquidation were included in the calculation, the IRR would have reached 17.7 percent per annum. CDO Plus notified BNY and Franklin of its position that the Fee should be calculated *pre-liquidation* and that Franklin therefore was not entitled to the Fee.[5]

---

[5] Franklin points out that CDO Plus has shifted positions. CDO Plus's principal, Don Uderitz, sent a February 2007 email calculating an even *greater* IRR (28.62 percent) but contending that Franklin had waived its

Controversy arose when Franklin submitted a claim for a Contingent Fee to BNY, totaling more than $7 million.[6]

Faced with that dispute, BNY asked deal counsel for a formal opinion interpreting the Indenture. Cleary concluded that Franklin was entitled to the Fee. Anticipating litigation between Franklin and the Shareholders, BNY (as Trustee) filed this interpleader action.

**D.  Procedural History**.  At the close of discovery, Franklin and the Shareholders filed cross-motions for summary judgment.  The district court ruled that, under the Indenture: (1) a Contingent Fee can be paid upon an optional redemption; and (2) the IRR calculation should include payments made on the redemption date.  See Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc., 674 F. Supp. 2d 458, 466-67, 470 (S.D.N.Y. 2009).  As to when the Fee accrues, the court found a contractual ambiguity that resisted summary judgment.  Id. at 473.

---

entitlement to the Fee by filing an untimely claim.  BNY rejected this untimeliness argument, and CDO Plus has not pursued the theory here.

[6] Franklin originally claimed a Fee of $7,220,205.60, but this claim increased to $7,466,654.47 after all interest payments due on portfolio investments were received.

Subject to the Shareholders' reservation of their right to challenge the finding that an ambiguity existed, the parties agreed to arbitrate the following issue: whether "the CLO II indenture should be interpreted to provide that the [Contingent Fee] accrues from the closing date of the transaction or accrues only from the date that the IRR Hurdle is met."[7]  SA 5.  In August 2011, following a four-day hearing, the arbitration panel adopted Franklin's position that the Fee accrues from the closing date of the CLO II transaction, even if it is payable only on a distribution date following achievement of a twelve percent IRR.

The court confirmed the arbitration award and granted Franklin summary judgment on its claim for attorney's fees. The court also awarded Franklin statutory prejudgment interest at a rate of nine percent pursuant to N.Y. C.P.L.R. § 5001(a).  On February 17, 2012, the court entered judgment in Franklin's favor for $12,763,039.33, consisting of contingent management fees of $7,466,654.47, attorneys' fees and costs of $2,064,188.63, and prejudgment interest of $3,205,196.23.

---

[7] Because of how the Contingent Fee is calculated, the accrual date significantly affects the size of the Fee.

10

**II**

We review a grant of summary judgment <u>de novo</u>. <u>See</u> <u>Compagnie Financiere de CIC et de L'Union Europeenne v.</u> <u>Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153, 157 (2d Cir. 2000). "The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." <u>Id.</u> at 158. If the court determines the operative contract to be ambiguous, it may evaluate the extrinsic evidence as a matter of law. <u>Id.</u> at 159-61.

The Shareholders contend that the district court committed four errors: the first relates to the court's use of extrinsic evidence, and the latter three involve the court's interpretation of certain Fee-related provisions of the Indenture.

**III**

The Shareholders argue that indentures "are governed by special, market-driven rules of construction" and that "courts are loathe to consider extrinsic evidence of the contracting parties' purported intentions when interpreting indenture provisions." Appellant Br. 21-22. They rely

principally on <u>Sharon Steel Corp. v. Chase Manhattan Bank, N.A.</u>, 691 F.2d 1039 (2d Cir. 1982).

"It is a well-established rule in this Circuit that the 'interpretation of Indenture provisions is a matter of basic contract law.'" <u>Jamie Sec. Co. v. The Ltd., Inc.</u>, 880 F.2d 1572, 1576 (2d Cir. 1989) (quoting <u>Sharon Steel Corp.</u>, 691 F.2d at 1049) (alterations omitted). The Indenture here is governed by New York law.

The district court thoroughly reviewed applicable principles of New York contract law before construing the provisions at issue. <u>See</u> <u>Bank of New York Trust, N.A.</u>, 674 F. Supp. 2d at 463-64. One such principle is that, if contract terms are ambiguous, "'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" <u>Id.</u> at 463 (quoting <u>British Int'l Ins. Co. v. Seguros La Republica, S.A.</u>, 342 F.3d 78, 82 (2d Cir. 2003)). The district court's application of that principle is consistent with <u>Sharon Steel</u>.

There, we construed "successor obligor" clauses in indenture agreements between bondholders and a debtor company in liquidation that sought to assign its debt to the

12

purchaser of its assets. <u>Sharon Steel Corp.</u>, 691 F.2d at 1042-46. We deemed it significant that the indenture clauses at issue were boilerplate. <u>Id.</u> at 1048. Such provisions are given a consistent, uniform interpretation because they "do not depend upon particularized intentions of the parties to an indenture." <u>Id.</u> "[T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets." <u>Id.</u> We therefore construed the terms as a matter of law based on their plain meaning, but also with reference to the purpose the wording was evidently drafted to serve. <u>See id.</u> at 1049-51.

The Shareholders argue that <u>Sharon Steel</u> counsels against drawing upon extrinsic evidence to interpret indenture provisions, as the district court did here (to a limited extent[8]). This argument is flawed for several reasons. [1] There is no evidence that the disputed terms in the CLO II Indenture are boilerplate: to all appearances, they were negotiated, tailored to the transaction, and

---

[8] As explained in Section V <u>infra</u>, the district court found extrinsic evidence to be dispositive only in determining whether proceeds of an optional redemption should be included in the calculation of the IRR.

13

govern the amount and trigger of a performance fee potentially in the millions.  [2] <u>Sharon Steel</u> expressly states that indentures are subject to basic principles of contract law.  <u>See</u> <u>supra</u> p. 12.  [3] Although the parties failed to produce such evidence, <u>Sharon Steel</u> allowed that "custom or usage might in some circumstances create a fact question as to the interpretation of boilerplate provisions."  <u>Id.</u> at 1048.  In sum, the district court's use of extrinsic evidence here is consistent with <u>Sharon Steel</u>, as subsequent case law confirms.[9]

The Shareholders also invoke the doctrine of <u>contra</u> <u>proferentem</u> as an alternative to extrinsic evidence when the language of the indenture is unclear.  <u>See</u> <u>Kaiser Aluminum</u> <u>Corp. v. Matheson</u>, 681 A.2d 392, 398-99 (Del. 1996).  However, it does them no good to have ambiguities construed against the drafter, because Franklin did not draft the contract--and did not sign it.  The Indenture was drafted by

---

[9] <u>See, e.g.</u>, <u>Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.</u>, 595 F.3d 458, 466 (2d Cir. 2010) (applying basic principles of New York contract law to indenture provisions and noting that evidence as to "custom and usage is to be considered by the court where necessary"); <u>Bank of N.Y. v. First Millennium, Inc.</u>, 598 F. Supp. 2d 550, 556 (S.D.N.Y 2009) (under New York law, if an indenture is "ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties").

14

Cleary as deal counsel and was entered into between the Issuers and the Trustee.  Contra proferentem is not an available doctrine here.

**IV**

The Shareholders argue that they were entitled to summary judgment because the Indenture precludes payment of a Contingent Fee upon an optional redemption.  They urge that Article 9 of the Indenture, which specifically governs optional redemptions, creates a separate distribution scheme that does *not* provide for a Contingent Fee and that trumps the distribution scheme set out in Article 11.

Article 9 pertains to the "Redemption of Notes."  JA 203-06.  Section 9.1, which applies to optional redemptions, contains no reference to any Contingent Fee payment.  But Section 9.1(e) is not an alternative payment schedule or "waterfall," as the Shareholders suggest; rather, it adds another step in the waterfall sequence set out in Article 11,[10] which is the only comprehensive scheme governing

---

[10] Section 9.1(e) provides: "After payment of the Notes and the expenses of the Co-Issuers on any Redemption Date, the Trustee shall pay (i) first, to the Class C-2 Redemption Additional Interest and (ii) second to the Preferred Share Paying Agent, for distribution to the Holders of the Preferred Shares as liquidating distributions, all remaining

15

distribution of interest proceeds and principal proceeds derived from obligations paid at maturity or upon liquidation of CLO II. On each distribution date, principal proceeds flow downward to pay, e.g., taxes and administrative expenses, JA 227 § 11.1(a)(ii)(A), and debt obligations to noteholders, JA 228 § 11.1(a)(ii)(D)-(H), until remaining proceeds are tapped for "payment of all due and unpaid Contingent Collateral Management Fees." JA 229 § 11.1(a)(ii)(J). The shareholders get the money that pools at the end. See JA 229 § 11.1(a)(ii)(L). Interest proceeds follow a similar course. See JA 225 § 11.1(a)(i).

Since Article 11 is made "subject to" certain other provisions in the Indenture, including Article 9,[11] the Shareholders contend that Article 9 controls. But we see no tension between these two provisions. Article 9 is read most naturally as supplementing Article 11, not supplanting it. Thus Article 9 itself states that the notes shall not

---

proceeds from the sale and/or termination of the Collateral and all other funds in the Collection Account." JA 204 § 9.1(e).

[11] "Notwithstanding any other provision in this Indenture, *but subject to the other subsections of this Section, Article 9, and Section 13.1*, on or, with respect to amounts referred to in Section 11.1(d), before each Distribution Date, the Trustee shall . . . ." JA 225 § 11.1(a) (emphasis added).

16

be optionally redeemed unless a financial institution agrees to pay "all administrative *and other fees and expenses payable under the Priority of Payments* [Article 11] prior to the payment of the Notes."[12] JA 203 § 9.1(b) (emphasis added). Article 9's reference to Article 11's Priority of Payments implies that optional redemptions incorporate the detailed distribution scheme established in Article 11.

The word "fees" does not appear in Section 9.1(e), but elsewhere in the Indenture the words "fees" and "expenses" are used interchangeably.[10] Consequently, the reference to "the expenses of the Co-Issuers on any Redemption Date" in Section 9.1(e) can be reasonably interpreted to include fees.

---

[12] The two provisions work in tandem. Article 11 sets out the priority of payments to take effect on a distribution date; and optional redemptions must fall on a distribution date. See JA 203 § 9.1(a).

[10] For instance, Section 11.1(a)(i)(B) provides for the payment of "accrued and unpaid Administrative Expenses *constituting expenses of the Co-Issuers (other than the Collateral Management Fee* but including other amounts payable by the Issuer to the Collateral Manager under the Collateral Management Agreement or this Indenture)." JA 225, § 11.1(a)(i)(B) (emphasis added). In this provision, "expenses of the Co-Issuers" is a category that *includes* the Contingent Fee (though it just happens to be carved out here).

17

The Shareholders assert that plain meaning analysis requires that we consider only how the two words are used inside Section 9.1(e); but 9.1(e), like all provisions, should be read in light of the whole agreement. See Brooke Group Ltd. v. JCH Syndicate 488, 663 N.E.2d 635, 637 (N.Y. 1996) ("[W]hen interpreting a contract, the entire contract must be considered so as to give each part meaning."). The Shareholders argue that Section 9.1(e) would have no force or effect unless it alters Article 11's Priority of Payments. See In re OnBank & Trust Co., 688 N.E.2d 245, 247 (N.Y. 1997) ("We decline to read the amendment in such a way as to render some of its terms superfluous.") (citations omitted). However, Section 9.1(e) provides for a specific class of payment called the "Class C-2 Redemption Additional Interest," to be paid only in the event of an optional redemption, an event that is not treated in Article 11. So construing Articles 9 and 11 together does not sap Section 9.1(e) of force and effect.

If the Shareholders were right--that Article 11's Priority of Payments does not apply when shareholders call an optional redemption, and that there can be no Fee in the event of an optional redemption--we would expect the Indenture to contain *some* language to this surprising

18

effect.  The Shareholders are arguing for specific and consequential inferences that do not inhere in Section 9.1(e) or in the Indenture as a whole.

The Shareholders' interpretation is also unworkable. Section 9.1(e) cannot function as a stand-alone distribution scheme and therefore cannot replace Article 11.  As discussed, Article 11 channels principal proceeds step-by-step through each class of payment upon a distribution date. It is similarly detailed as to interest proceeds.  In contrast, the single sentence of Section 9.1(e), if read in isolation (as the Shareholders urge), leaves to the imagination how classes of noteholders are to be paid, and in what order, and how the portfolio manager is to be paid (in base fees, subordinated fees, or contingent fees), and in what order.  Article 9 is therefore no useful substitute for Article 11.  The Shareholders' reply brief effectively concedes as much.  See Appellant Reply Br. 10 ("[T]he language in Article 9.1(e) referring to 'payment of the Notes and expenses of the Co-Issuers' necessarily implicates aspects of the Article 11 waterfall . . . .").

Finally, the contract must be read to conform to the parties' reasonable expectations.  See Spear, Leeds & Kellogg v. Cent. Life Assurance Co., 85 F.3d 21, 28 (2d Cir.

1996).  The parties cannot reasonably have intended for shareholders to be able to avoid the Contingent Fee by exercising an *option* to redeem at any time prior to the scheduled maturity date, particularly since poor performance is not the only reason to elect redemption: shareholders might seek redemption to lock in early gains.  Moreover, under the Shareholders' view of the Indenture, Article 9 would eliminate *all* fees upon an optional redemption, including the subordinated collateral management fee and the base collateral management fee, which are, by definition, guaranteed.  See JA 70, 116-17.

Accordingly, we conclude that the Indenture allows for the distribution of the Contingent Fee upon an optional redemption.[11]

---

[11] Franklin offers various kinds of extrinsic evidence, including Franklin's contemporaneous internal and external communications illustrating its expectation that the Fee could be paid upon an optional redemption; communications between BNY, deal counsel, and the Shareholders; the CLO III transaction; the CLO II Model constructed by Merrill; and industry custom and practice.  The district court did not find it necessary to consider this evidence given the contract's plain language, and neither do we.

**V**

Franklin's eligibility for the Fee depends on whether the portfolio's IRR reached the twelve percent threshold, which in turn depends on whether the proceeds of the optional redemption are taken into account.

The Shareholders urge that the waterfall structure in Article 11 renders Franklin's suggested calculation method impossible, because the calculation and payment of the Fee (at Step J of the priority of payments) cannot be based on the funds in the final distribution made at Step L. See JA 229 § 11.1(a)(ii)(J)-(L). As the Shareholders describe it, the funds cannot flow up a waterfall.

The Shareholders are pressing the waterfall analogy much too hard. Article 11 sets forth a payment *distribution* scheme. These calculations of what is to be distributed at each level can of course be made in advance of the actual distribution of the proceeds, and must be. Article 11 confirms that such calculation must take place *prior* to the distribution:

> In connection with the application of funds to pay [Contingent Fees] in accordance with [this Article], no more than one Business Day[] after the Due Period ending prior to such Distribution Date, the Collateral Manager shall deliver to the Trustee a calculation of the amount payable on such Distribution Date.

21

**A 229 § 11.1(e)**.  The Collateral Manager could hardly deliver a calculation to the Trustee prior to the distribution date without taking into account proceeds that have not descended any step of the Waterfall--including the final distribution at Step L.

The issue is conclusively resolved by the definition of "Contingent Collateral Management Fee," which contemplates that calculation of the IRR will include proceeds "from the Closing Date through such Distribution Date":

> The fee payable for each Interest Accrual Period to the Collateral Manager in arrears on each Distribution Date . . . ; <u>provided</u>, <u>however</u>, that the [CCMF] will be payable on each Distribution Date only to the extent that (i) holders of the Preferred Shares have received an internal rate of return of 12% per annum . . . on the amount of the initial purchase of the Preferred Shares for the period from the Closing Date through such Distribution Date.

JA 79 (emphasis in original).  In this context, "through" means "up to and including."  18 <u>Oxford English Dictionary</u> 11 (2d ed. 1989); <u>see also</u> <u>Curlett Family Ltd. P'ship, Ltd. v. Particle Drilling Techs., Inc.</u>, 254 F. App'x 320, 324 n.4 (5th Cir. 2007).

We are bound, first and foremost, by the terms' plain meaning.  See <u>Laba v. Carey</u>, 277 N.E.2d 641, 644 (N.Y. 1971).  The clarity of the contractual language here

22

obviates a need to consider extrinsic evidence.[12]  See

Rainbow v. Swisher, 527 N.E.2d 258, 259 (N.Y. 1988).  The

Shareholders actually acknowledge that "proceeds received

'through' a given Distribution Date may be counted in

determining whether the . . . Shareholders have received a

12% IRR on that date."  Appellant Reply Br. 14.  Evidently,

this concession is made to assist the Shareholders' argument

that Franklin would be entitled to the Fee "only on the *next*

Distribution Date," which, in the context of an optional

redemption, never comes.  Id.  This reading of the Indenture

is implausible, to say the least.  The Indenture itself thus

---

[12] At an earlier stage of the litigation, the district
court concluded that the Indenture was ambiguous on this
point.  See Bank of N.Y. Trust, N.A. v. Franklin Advisors,
Inc., 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007).  At summary
judgment, the court considered extrinsic evidence such as
testimony by Rick Caplan, an industry expert, who stated
that it was "'standard in the industry . . . that optional
redemption date proceeds are included in calculating whether
the equity holders have reached the IRR hurdle rate.'"  Bank
of N.Y. Trust, N.A. v. Franklin Advisers, Inc., 674 F. Supp.
2d 458, 468 (S.D.N.Y. 2009) (quoting Caplan).  Deal counsel
Raymond Check confirmed that the calculation of the IRR was
intended to account for all returns "through and including"
the distribution date, and that this usage and
interpretation is common in the industry.  Id. at 468-69.
The district court observed that the Shareholders failed to
produce "any evidence tending to show that the word
'through' in the clause at issue is not to be interpreted to
include Redemption Date payments" and that "the extrinsic
evidence is thus one-sided in favor of Franklin Advisers'
interpretation."  Id. at 470.  Because no reasonable jury
could find for the Shareholders on this issue, the court
therefore granted summary judgment to Franklin.  Id.

makes plain that calculation of the IRR includes redemption proceeds; we need look no further.

**VI**

Having concluded that a Fee is payable following an optional redemption, and that calculation of the Fee takes into account redemption proceeds, we turn to the issue of accrual: Franklin argues that the Fee began to accrue at the date of closing (July 26, 2001); the Shareholders argue that it did not begin to accrue until the date the portfolio surpassed the IRR Hurdle (February 28, 2007). On this point, the district court found the contract ambiguous and the extrinsic evidence mixed, thus creating a genuine issue of material fact. The parties submitted the issue to an arbitration panel, which concluded that the evidence favored Franklin's position overwhelmingly. We discern no error in the district court's decision.

By definition, the Fee is triggered only upon the portfolio reaching an internal rate of return of twelve percent per annum. The Fee is calculated as the "accrued and unpaid Contingent Collateral Management Fee (consisting of the Contingent Collateral Management Fee *accrued for the related Interest Accrual Period and any such fee accrued for*

24

*prior Due Periods but not paid on any prior Distribution Date*) that is payable on such Distribution Date as described above."[13]  JA 79-80 (emphasis added).

Neither argument is compelled by the wording.  The provision states that the Contingent Fee includes any fee accrued (but not yet paid) for this or prior periods, without specifying an accrual date.  The Shareholders' reading strikes us as unlikely because it would mean that whenever the portfolio manager achieves the stated goal of producing a twelve percent annual IRR, it is entitled to nothing except the potential for a fee, large or small, at some point in the future--subject to the whim of shareholders who may avoid that fee award by taking an optional redemption.  Such an incentive fee award creates virtually no incentive at all.

Nevertheless, the Indenture contains two seemingly inexplicable features.  First, as the Shareholders point out, the Principal Proceeds Waterfall provides for the payment of all "due and unpaid" fees, JA 229 § 11.1(a)(ii)(J), while the Interest Proceeds Waterfall

---

[13] The Indenture further provides that the Fee shall not exceed forty percent of all interest and principal proceeds available for distribution after the portfolio has reached an IRR of twelve percent.  See JA 80.

25

provides for the payment of "(1) the Contingent Collateral Management Fee for such Distribution Date, and then (2) all *accrued and unpaid* Contingent Collateral Management Fees accrued on prior Distribution Dates."  JA 227 § 11.1(a)(i)(O) (emphasis added).  The distinction (if any) between "due and unpaid" and "accrued and unpaid" is not clear; but, even if the distinction is meaningful, it does not indicate whether accrual begins at closing or upon surmounting the IRR Hurdle.

Second, the definition of "Subordinated Collateral Management Fee," one of two guaranteed fees *not* tied to performance, states that the fee "accrue[s] from the Closing Date whether or not currently payable."  JA 116-17.  Since it would have been easy and consistent to include such clear wording in the definition of the Contingent Fee (if that is what the parties intended), the absence lends support to the Shareholders' argument that the Fee does *not* accrue at closing.  However, as the district court observed, the two fees serve distinct purposes and are described in different terms throughout the Indenture.  See Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc., 674 F. Supp. 2d 458, 470-71 (S.D.N.Y. 2009).

26

The parties strain to find support in the Indenture for their competing interpretations. As is sometimes the case, a detailed and ramified contract--even one that attempts to provide for innumerable contingencies, to anticipate disputes and to preempt litigation--may yet be silent as to a question that later becomes critical. Reliance upon extrinsic evidence then becomes perfectly appropriate. See British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003) (applying New York law). The district court therefore committed no error.[14]

**VII**

The Shareholders challenge the district court's ruling that prejudgment interest of nine percent is mandatory under N.Y. C.P.L.R. § 5001(a). See Bank of New York Trust, N.A. v. Franklin Advisers, Inc., No. 07 Civ. 1746 (S.D.N.Y. Nov.

---

[14] As noted supra p. 24, the district court ultimately determined that the extrinsic evidence was not conclusive, and the parties submitted the issue to an arbitration panel. The panel decided the issue in Franklin's favor, concluding that a "large amount" of evidence indicated that the Fee was intended to accrue at closing. SA 27. For example, the panel found it significant that a Merrill Lynch financial model created for CLO II calculated the Fee to accrue from closing regardless of whether it was actually payable in a particular period. The panel also found that "it was the uniform practice and custom in the industry that once the IRR Hurdle had been satisfied in a CLO transaction, the [Fee] would be payable from the time of the closing of the transaction." SA 23.

27

15, 2011) (ECF No. 145).  We agree with the Shareholders that this was error.

We start with the interpleader statute, N.Y. C.P.L.R. § 1006(f), which provides that if a court determines that a claimant in an interpleader action is entitled to interest, the stakeholder "shall be liable to such party for interest to the date of discharge at a rate no greater than the lowest discount rate of the Federal Reserve."  N.Y. C.P.L.R. § 1006(f) (McKinney 2013).  This statute "provides for an award of interest against a *stakeholder* up to the time of discharge . . . but not against unsuccessful *claimants*." Mfr.'s & Traders Trust Co. v. Reliance Ins. Co., 870 N.E.2d 124, 126-27 (N.Y. 2007) (emphasis added).  As a result, "the interest award here must be authorized, if at all, by the general interest statute, CPLR 5001(a)."  Id. at 127.

Section 5001(a) provides for a mandatory award of prejudgment interest in certain actions, including those for breach of contract, but the statute contains an exception for actions at equity:

> Interest shall be recovered upon a sum awarded
> because of a breach of performance of a contract,
> or because of an act or omission depriving or
> otherwise interfering with title to, or possession
> or enjoyment of, property, *except that in an action
> of an equitable nature, interest and the rate and*

28

*date from which it shall be computed shall be in the court's discretion.*

N.Y. C.P.L.R. § 5001(a) (McKinney 2013) (emphasis added).

Because interpleader actions "are indeed equitable," Manufacturer's, 870 N.E.2d at 127, the district court erred in concluding that the award was mandated by statute. Cf. United Bank Ltd. v. Cosmic Int'l, Inc., 542 F.2d 868, 878 (2d Cir. 1976) (holding that prejudgment interest *was* required by statute because, while Section 5001 "specifically excepts 'action(s) of an equitable nature' from the provision's mandatory scope," the stakeholder did not file an interpleader action).

In Manufacturer's, the Court went a step further, holding that the successful claimant was not entitled to statutory prejudgment interest because there was no "sum awarded" against the adverse parties. 870 N.E.2d at 127. Additionally, the Court observed that there had been no finding that the losing claimants breached any contract, interfered unlawfully with the possession or enjoyment of any property, asserted frivolous claims, conducted vexatious litigation, or acted solely to cause delay. Id. at 127-28. As a result, there was no basis for an award of statutory prejudgment interest against them.

29

The same is true here.  The only meaningful distinction is that, in <u>Manufacturer's</u>, the parties had inexplicably failed to place the contested funds in an interest-bearing account, so that the successful claimant received no compensation for the lost use of its money.  <u>Id.</u> at 128. Here, however, the Trustee deposited the stake with the district court, which placed the funds in an interest-bearing account.  Franklin is entitled to that accrued sum, and no more.  Accordingly, we vacate the award of statutory prejudgment interest and remand with the instruction to award the prejudgment interest actually accrued on the $7,466,654.47 fee owed to Franklin, to be paid from the court's account.

**VIII**

Finally, the Shareholders challenge the award of attorney's fees.  Without contesting the amount (approximately $2 million), they argue that Franklin is entitled to indemnification only for costs incurred in litigation with third parties, not with contracting parties. However, this litigation *is* a third-party dispute.

The Collateral Management Agreement (the "Agreement") provides:

30

The Issuer shall indemnify and hold harmless [Franklin] . . . from and against any and all Liabilities, and will reimburse [Franklin] for all reasonable fees and expenses (including reasonable fees and expenses of counsel) . . . as such Expenses are incurred in investigation, preparing, pursuing, or defending any claim, action, proceeding or investigation *with respect to any pending or threatened litigation* (collectively, the "Actions"), caused by, or arising out of or in connection with the issuance of the Offered Securities . . . .

JA 321 § 10(b) (emphasis added). Franklin contends that this indemnification provision applies broadly to "any pending or threatened litigation" and has no language restricting it to third-party actions, which is true enough. But neither does it clearly state that the provision applies to third-party claims; and we are wary of the inference that indemnification clauses apply to litigation between the parties in the absence of express wording. See Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003) ("Promises by one party to indemnify the other for attorneys' fees run against the grain of the accepted policy that parties are responsible for their own attorneys' fees."). In New York, courts "'should not infer a party's intention' to provide counsel fees as damages for a breach of contract 'unless the intention to do so is unmistakably clear' from the language of the contract." Id. (quoting

31

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989)). Where, as here, the contract does not "exclusively or unequivocally refer[] to claims between the parties themselves," *Hooper Assocs., Ltd.*, 548 N.E.2d at 905, we will presume that indemnification extends only to third-party disputes.

However, it matters not whether the Agreement covers litigation between the contracting parties because this litigation *is* a third-party dispute. The Agreement was entered into between Franklin and the Issuers. The Shareholders concede (in another context) that they "played no role whatsoever in the execution and drafting of the [Agreement]." Appellant Reply Br. 26. Accordingly, this dispute does not implicate the warning in Oscar Gruss against broadly construing indemnification clauses to cover litigation between contracting parties.

Additionally, indemnification clauses (like most other contractual provisions) should be read to implement the parties' intentions, to the extent possible. See Oscar Gruss & Son, Inc., 337 F.3d at 199. The Agreement here specifically contemplates litigation between management and shareholders. In discussing the limits of Franklin's responsibilities, Section 10(a) refers to Franklin's

32

potential liability for mismanaging its investments and providing misleading marketing materials.  JA 320 § 10(a). These are fertile areas of litigation with investors, as is management fees.  Because the parties' intent is ascertainable from the plain wording of the agreement, indemnification does not offend the rule that "such contracts must be strictly construed to avoid inferring duties that the parties did not intend to create."  <u>Id.</u>  We therefore affirm the indemnification award.

<b>CONCLUSION</b>

For the foregoing reasons, we affirm the grant of partial summary judgment to Franklin and the denial of summary judgment to the Shareholders, as well as the award of attorney's fees and costs, but we vacate the award of statutory prejudgment interest and remand with the instruction to award actual interest.