# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 17-1702

———————————————

Hildene Opportunities Master Fund, Ltd.

*Plaintiff - Appellant*

v.

Arvest Bank, et al.

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the Western District of Missouri - Kansas City

——————————

Submitted: February 14, 2018
Filed: July 30, 2018

——————————

Before LOKEN, BENTON, and ERICKSON, Circuit Judges.

——————————

LOKEN, Circuit Judge.

In 2012, Arkansas-based Arvest Bank (Arvest) purchased assets and assumed liabilities of Union Bank, a subsidiary of Bannister Bancshares, Inc. (Bannister), a Missouri bank holding company. Hildene Opportunities Master Fund, Ltd. (Hildene), a Cayman Islands-based hedge fund, sued Bannister and Arvest, alleging that the transaction breached the "successor obligor" term of an indenture agreement (the Indenture) between Bannister and U.S. Bank National Association as trustee (U.S.

Bank), and that Arvest tortiously interfered with the Indenture. Hildene appeals the district court's[1] grant of summary judgment dismissing the tortious interference claim. Reviewing the grant of summary judgment *de novo*, including the court's interpretation of state law, we conclude the asset purchase transaction did not violate the Indenture and affirm. See HIP, Inc. v. Hormel Foods Corp., 888 F.3d 334, 338 (8th Cir. 2018) (standard of review).

## I. Background

In 2003, by an Amended Declaration of Trust naming U.S. Bank as Trustee, Bannister created a trust that issued 20,000 Floating Rate Capital Securities, commonly known as trust preferred securities or "TruPS." The trust sold the TruPS debentures to Preferred Term Securities XII, Ltd. and Preferred Term Securities XII, Inc. for $20 million under the terms of the Indenture, with U.S. Bank acting as Indenture Trustee. After purchasing the TruPS debentures, the Preferred Term Securities XII entities created a collateralized debt obligation, with Bank of New York Mellon as trustee, and issued Senior Notes, some of which Hildene purchased.

Bannister's purpose in declaring the trust and creating the Indenture was to provide "Tier I Capital" for its subsidiary, Union Bank, whose shares constituted most of Bannister's assets. As one court has explained:

> Between 2002 and 2007 . . . [m]any bank holding companies found TruPS attractive because they seemingly combined the best features of debt and equity: The bank holding company could deduct payments to investors as interest expense yet treat the security as equity capital under then-applicable banking regulations. To achieve this favorable duality, the bank holding company does not issue TruPS directly. Rather, it

---

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

forms a wholly owned trust subsidiary that issues preferred equity securities -- the TruPS -- to investors. . . . The bank holding company makes payments of principal and interest on the notes, and the trust uses the payments to redeem or pay dividends on the TruPS.

In re BankAtlantic Bancorp, Inc. Litig., 39 A.3d 824, 827 (Del. Ch. 2012). The federal banking laws establish minimum capital requirements and capital adequacy standards for banks insured by the Federal Deposit Insurance Corporation (FDIC). See 12 C.F.R. § 324.1(a). In 2003, the components of Tier 1 Capital included "common stockholders' equity" and qualifying "perpetual preferred stock" subject to strict limitations. 12 C.F.R. § 325, App. A § 1 (2003). The Federal Reserve Bank applied this capital category to bank holding companies. See 12 C.F.R. § 225, App. A § 1 (2003). Capital restrictions are intended to protect the FDIC trust fund, through which the government absorbs losses of failed banks, as well as bank depositors and creditors.

Following the global financial crisis, Union Bank's financial position deteriorated. In June 2009, Bannister exercised its option under the Indenture to defer paying interest on the TruPS debentures for five years. In October, the FDIC issued an order directing Union Bank to cease and desist from operating with inadequate capital, allowances for loan and lease losses, liquidity, and earnings. The Order increased Union Bank's minimum Tier 1 Capital requirement from 6% to 8% of total assets, and prohibited Union Bank from paying cash dividends without FDIC approval. In July 2010, Bannister agreed with the Federal Reserve Bank of Kansas City that it would take steps to ensure that Union Bank complied with the FDIC consent order, not make distributions on the TruPS debentures without the Reserve Bank's approval, and submit annual cash flow projections and quarterly progress reports. As in BankAtlantic, the message of these regulatory actions seems clear: "regulators wanted [Union Bank] to become part of a stronger, better-capitalized franchise." 39 A.3d at 834.

-3-

In 2011, the First National Bank of Olathe, Kansas, failed, causing a substantial loss to the FDIC. Because the Olathe bank was controlled by a holding company that owned a majority interest in Bannister, the FDIC assessed a $120 million cross-guaranty lien against Union Bank's assets. See 12 U.S.C. § 1815(e). Working with an investment bank, Bannister searched for a merger partner for Union Bank. Arvest was looking to enter the Kansas City, Missouri, retail banking market, and Union Bank operated branches in the Kansas City area. Though aware of Union Bank's financial condition, Arvest considered Union Bank an attractive acquisition because of these branch locations. After lengthy negotiations, Arvest and Union Bank executed an Asset Purchase Agreement in January 2012 in which Arvest agreed to acquire substantially all of Union Bank's assets, valued at $368 million; assume $407 million of Union Bank's liabilities (primarily customer bank deposits); and pay Union Bank $1 plus a contingent future payment based on the performance of the acquired loan and real estate portfolios.[2] Arvest conditioned the Asset Purchase Agreement on the FDIC agreeing to waive its claim of cross guaranty liability against Union Bank. Arvest did not agree to assume liabilities to the Indenture's TruPS securities.

In February 2012, the Federal Reserve Bank of Kansas City advised Bannister that Union Bank was "Significantly Undercapitalized and . . . in dire need of capital resources," and that Bannister "continues to be in Troubled Condition for supervisory purposes." The Reserve Bank asked Bannister to "keep us informed of your progress with regard to these negotiations [with Arvest] and/or other recapitalization efforts." Reviewing Union Bank's financials for the first quarter of 2012 after the Arvest

---

[2]Though this looks to an outsider like Arvest paid too much for Union Bank's assets, looks can be deceiving. Core deposits provide low-cost financing, generate fee income, and are viewed favorably by bank regulators; customers are reluctant to transfer their accounts. "For all of these reasons, banks willingly pay a premium for deposits, typically structured by having the acquiring institution assume a larger quantum of deposits than the assets transferred." BankAtlantic, 39 A.3d at 831.

transaction closed, Hildene's analyst opined, "this bank probably would not have made it another quarter."

Section 3.7 of the Indenture provided that Bannister may not "sell or convey all or substantially all of its property to any other Person" unless it complied with Article XI of the Indenture, including the "successor obligor" provision in § 11.1:

> Nothing contained in this Indenture or in the Debentures shall prevent . . . any sale, conveyance, transfer, or other disposition of the property or capital stock of the Company . . . to any other Person . . . provided, however, that the Company . . . agrees that, upon any such . . . sale, conveyance, transfer or other disposition, the due and punctual payment of the principal of . . . and interest on all of the Debentures . . . shall be expressly assumed by supplemental indenture . . . by the entity which shall have acquired such property or capital stock.

(Emphasis added.)  The Indenture defined "Company" to mean "Bannister . . . and, subject to the provisions of Article XI, shall include its successors and assigns."

In March 2012, in response to a U.S. Bank inquiry, counsel for Bannister advised that Article XI of the Indenture did not apply to the Arvest Asset Purchase Agreement because Bannister was not selling any of its property, the outstanding stock of Union Bank and "a small handful of immaterial assets.  After the closing contemplated by the Agreement [Bannister] will continue to hold exactly those same assets."  The letter advised that Arvest will not assume Bannister's obligations under the Indenture because those obligations "are not obligations of Union [Bank and] do not (and cannot) encumber Union [Bank]'s operations or assets."  The letter noted that, because Union Bank's cross guaranty liability to the FDIC far exceeded Union Bank's total capital, "[a]n assertion of cross guarantee liability by the FDIC would result in the failure of Union."

Arvest obtained approvals of the Asset Purchase Agreement by the Federal Reserve Bank of St. Louis and the Arkansas State Bank Department; Union Bank obtained approval by the Missouri Division of Finance; and the FDIC agreed to waive its cross guaranty lien against Union Bank. The Agreement closed June 22, 2012, protecting depositor accounts; Arvest hired most of Union Bank's employees, and Union Bank ceased operations. One month later, U.S. Bank issued a Notice of Default advising investors that the transaction "constitutes the sale of substantially all of the assets of the Company and that compliance with Article XI was required," but that no trust assets were "available to the Trustee for the taking of any actions in connection with this Default." Bannister filed Articles of Dissolution in 2013.

Hildene sued Bannister and Arvest, asserting breach of the successor obligor requirement and tortious interference with contract by Arvest. The district court dismissed the First Amended Complaint because Hildene failed to show it was a third-party beneficiary to the Indenture or a real party in interest. Hildene received an assignment of claims from U.S. Bank as Trustee and filed a Second Amended Complaint. On cross-motions for summary judgment, the district court determined that Hildene's tortious interference claim was barred by the statute of limitations and failed on the merits because Bannister did not breach the successor obligor provision and Arvest did not use improper means in the transaction. The court granted partial summary judgment on Hildene's claim that Bannister breached the Indenture by failing to pay interest. Only the grant of summary judgment dismissing Hildene's tortious interference claim is at issue on appeal.

## II. Discussion

While the parties disagree whether Missouri or Arkansas law governs Hildene's tortious interference claim against Arvest, and whether Missouri and Arkansas tortious interference law are equivalent in all respects, there is no question that a viable claim of tortious interference under either State's law requires proof of

a breach of the underlying contract. See El Paso Prod. Co. v. Blanchard, 269 S.W.3d 362, 373-74 (Ark. 2007); Bishop & Assocs., LLC v. Ameren Corp., 520 S.W.3d 463, 472 (Mo. 2017). As we conclude that Bannister did not breach the Indenture's successor obligor provision, we need not decide which law applies. Phillips v. Marist Soc'y of Wash. Province, 80 F.3d 274, 276 (8th Cir. 1996). The parties agree that, by reason of the choice-of-law provision in § 14.5 of the Indenture, New York law governs this breach of contract issue.

"Interpretation of indenture provisions is a matter of basic contract law." Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1049 (2d Cir. 1982), cert. denied, 460 U.S. 1012 (1983). New York law follows the familiar principle that a contract that is "complete, clear and unambiguous on its face" will be "enforced according to the plain meaning of its terms." Cortlandt St. Recovery Corp. v. Bonderman, 96 N.E.3d 191, 198 (N.Y. 2018) (quotation omitted). Bannister did not sell its Union Bank stock (or any other asset) to Arvest, § 11.1 of the Indenture limited the successor obligor provision to sales of substantially all the assets of the "Company," and the Indenture defined "Company" to mean Bannister and its successors and assigns. Therefore, the district court concluded:

> holding [that] Bannister breached the Successor Obligor Provision would require rewriting the Bannister Indenture terms to include "subsidiary" in the Successor Obligor Provision, contrary to the clause's language which does not include Bannister's subsidiaries. Accordingly . . . the Bannister Indenture's Successor Obligor Provision was not breached . . . because Bannister retained its Union Bank stock.

The district court's reasoning was sound, for New York courts follow the well-established principle that, "when a contract specifically defines a word that has various possible meanings, [the court] looks to the plain meaning of that definition." Gateway Customer Sols., LLC v. GC Serv. Ltd. P'ship, 825 F.3d 502, 506 (8th Cir.

2016); see Selective Ins. Co. of Am. v. Cty. of Rensselaer, 47 N.E.3d 458, 461-62 (N.Y. 2016).

On appeal, Hildene ignores the district court's reasoning. Rather, relying on the general purpose of successor obligor provisions as discussed in Sharon Steel, 691 F.2d at 1050, and in BankAtlantic, 39 A.3d at 838, Hildene argues "[i]t would be absurd for Section 11.1 to be interpreted in a manner that excluded Union Bank's assets in a situation where Bannister's only material assets were those assets and some now-worthless stock." But Sharon Steel involved the sale of *its* assets by the company that had sold subordinated debentures subject to the indenture, and BankAtlantic involved a bank holding company's sale of its *stock* in the debenture-funded bank subsidiary. In both cases, the transactions fell within the plain meaning of the successor obligor provision, and the fighting issue was whether the debenture issuer sold substantially all of its assets. 691 F.2d at 1049-51; 39 A.3d at 838-43.

In addition to arguing that we should simply ignore the plain meaning of the Indenture's definition of "Company," which we may not do, Hildene is wrong to suggest that "it would be absurd" for § 11.1 to apply to a sale by Bannister of stock in its Union Bank subsidiary, but not to a sale by Union Bank of substantially all its assets. As the above summarized facts of this case demonstrate, banks are heavily regulated, and distressed banks are subject to drastic regulatory remedies intended to protect depositors, creditors, and the FDIC trust fund. It is not absurd to assume that the sophisticated attorneys and bankers who drafted the Bannister Declaration of Trust and Indenture intentionally declined to give the TruPS investors -- who were being put in the mix to provide Union Bank equity capital, not as bank creditors -- the ability to block the sale of a distressed subsidiary bank's assets by enforcing a parent-company indenture provision that would make the bank's assets unmarketable. Nor is it absurd to suspect that bank regulators, exercising either the Federal Reserve Bank's authority over bank holding companies, or the FDIC's authority over Union Bank's capital structure, would not approve a holding company transaction designed

to augment Union Bank's Tier 1 Capital that imposed this restriction on the sale of a distressed bank's assets. Cf. Fed. Res. Bd. Press Release, 1996 WL 601940 (F.R.B.) (Oct. 21, 1996).

There is further support for our conclusion that the plain meaning of the Indenture definition of "Company" should be enforced. Successor obligor provisions are so common in indenture agreements that the American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions* have long included model provisions and commentary. Section 11.1 of the Indenture is almost identical to the successor obligor provision in BankAtlantic, 39 A.3d at 828-29, and incorporates the substance of section 8-1 of the *Commentaries* (1971). Section 10-13 of the *Commentaries* notes that "[i]ndenture provisions which are made applicable to the consolidated activities of the Company and certain of its subsidiaries would usually include provisions which restrict the consolidation or merger of such subsidiaries and the disposition of their assets as an entirety or substantially as an entirety." Sample Covenant 5 is a model provision limiting mergers and sales of assets by the "Company's" subsidiaries.

Covenant 5 to Section 10-13 of the *Commentaries* establishes that the drafters of the Bannister Indenture surely knew of this alternative. See Quadrant Structured Prods. Co., Ltd. v. Vertin, 16 N.E.3d 1165, 1176, 1178 (N.Y. 2014) (sophisticated parties are "well aware of these commentaries"); Bonderman, 96 N.E.3d at 202. ("If the parties to the indenture intended [a particular limitation] the signatories to the indenture could have easily said so."). Likewise, other courts have described the *Commentaries* as "powerful evidence of the established commercial expectations of practitioners and market participants," BankAtlantic, 39 A.3d at 837 (quotation omitted), and as "specialized dictionaries" in interpreting an indenture, Matter of Envirodyne Indus., Inc., 29 F.3d 301, 304-305 (7th Cir. 1994).

Hildene was not a party to the Declaration of Trust and Indenture. It proffered no extrinsic evidence supporting the notion that the drafters did not intend to limit the definition of the word "Company," and therefore the reach of § 11.1, to Bannister but not its subsidiaries. Under New York indenture law, it could have done so. See Bank of N.Y. Trust Co. v. Franklin Advisers, Inc., 726 F.3d 269, 276 (2d Cir. 2013). Section 3.10 of the Indenture expressly provided that Bannister "shall not cause or permit any Subsidiary" to issue "Additional Junior Indebtedness," further evidence that the failure to include sales of a subsidiary's assets in § 11.1 was intentional. On this summary judgment record, we reject Hildene's speculation as to what was absurd and affirm the district court's interpretation of the plain meaning of the term "Company" in § 11.1.

Hildene further argues that Bannister breached the successor obligor provision because the assets Union Bank sold to Arvest were Bannister's "property" under § 11.1 of the Indenture. In the district court, Arvest argued that it purchased assets and assumed liabilities directly from Union Bank and therefore the transaction "did not involve the sale or conveyance of any of Bannister's property." Relying heavily on BankAtlantic's discussion of the purpose of successor obligor provisions, Hildene responded that it would not "make sense" for the parties to allow Bannister to "transfer all the *value* of its 'property'" and still maintain its obligation to TruPS creditors. Thus, the argument pressed on appeal was neither made to nor addressed by the district court.

Even if preserved for appeal, the argument again runs afoul of the Indenture's plain language. Construing the term "property or capital stock of the Company" in § 11.1 as meaning property directly owned by Bannister (whether assets or liabilities) is consistent with the well-established principle that parent companies do not own the assets of their subsidiaries. See Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003); JPMorgan Chase Bank, N.A. v. Malarkey, 884 N.Y.S.2d 787, 790 (N.Y. App. 2009). The model successor obligor provision in section 8-1 of the *Commentaries*

limits the debenture-issuing Company's freedom to "transfer its properties and assets substantially as an entirety to any Person." Covenant 5 in section 10-13 limits the Company's freedom to "permit any Subsidiary to . . . transfer its properties as an entirety or substantially as an entirety." Drafting a provision that applies a successor obligor provision to a third party who is acquiring no assets or liabilities directly from the debenture-issuing obligor would be no simple matter (Covenant 5 imposes no successor obligation on a third party purchaser). We conclude that the plain meaning of the word "property" in this context is property directly owned by Bannister, the "company" that signed the Indenture. Bannister's "property and capital stock" does not include assets of Bannister subsidiaries. Hildene cites no contrary authority.

Hildene argues that because the Union Bank shares were the majority of Bannister's assets, the parties could not have intended to allow Union Bank to transfer its assets unfettered by the successor obligor provision. Hildene describes the sale of Union Bank assets as "sleight of hand" and "trickery" designed to avoid the result in BankAtlantic, where the bank holding company's agreement to sell its stock in the bank subsidiary was enjoined as contrary to the successor obligor provision. But as a matter of corporate law, there is a well-recognized difference between a parent company's interest in the stock and the assets of its subsidiary.

Union Bank was in dire financial straits at the time of the transaction. Had the FDIC enforced its powerful cross guaranty lien, the interests of TruPS equity investors, including investors like Hildene whose Senior Notes had no greater priority, would almost surely have been wiped out. See 12 U.S.C. § 1815(e)(2)(C)(i)(I). The plain language of the successor obligor provision as drafted did not apply to the Arvest/Union Bank transaction, a sale that recapitalized a distressed bank, protected Union Bank's depositors and employees, and was approved by state and federal bank regulators. Despite advance knowledge of the transaction, U.S. Bank as Trustee did not seek an injunction, as the TruPS investors did in BankAtlantic, 39 A.3d at 843. Rather, U.S. Bank declared a default after the

-11-

transaction closed and advised that it would not pursue a remedy, leaving sophisticated investors like Hildene to make a silk purse out of this sow's ear. In these circumstances, there was no sleight of hand or trickery. We conclude the district court did not err in dismissing Hildene's tortious interference claim against Arvest because Bannister did not breach the Indenture's successor obligor provision.[3]

The judgment of the district court is affirmed.

_____

---

[3]Based on this conclusion, we need not address the district court's rulings that Hildene's tortious interference claim was barred by the statute of limitations, and that Hildene failed to prove the improper-means element of that claim.